# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 17, 2014 Session

# IN RE AYDEN J. C.[1]

**Appeal from the Juvenile Court for Union County**
**No. 8397    Hon. Darryl Edmondson, Judge**

---

**No. E2013-02644-COA-R3-PT-FILED-SEPTEMBER 15, 2014**

---

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate Parents' parental rights to the Child. The trial court found that clear and convincing evidence existed to support the termination on the statutory grounds of abandonment for failure to remit support, substantial noncompliance with the permanency plans, and the persistence of conditions which led to removal. The court further found that termination of each parent's parental rights was in the best interest of the Child. Parents appeal. We reverse the court's termination of Father's parental rights for failure to remit child support. We affirm the court's termination of parental rights in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Andrew J. Crawford, Knoxville, Tennessee, for the appellant, Lillian A. C.

Clarence E. Pridemore, Jr., Knoxville, Tennessee, for the appellant, Joshua C.

Robert E. Cooper, Jr., Attorney General and Reporter, and Jordan Scott, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Kevin B. Fox, Knoxville, Tennessee, guardian ad litem for the minor, Ayden J. C.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

## OPINION

## I. BACKGROUND

Ayden J. C. ("the Child") was born to Lillian A. C. ("Mother") and Joshua C. ("Father") in June 2010. Mother was sixteen years old at the time of the Child's birth, while Father was unavailable to parent the Child due to his incarceration at various times throughout the Child's life. The Child was born with gastroschisis, a condition in which his stomach and intestines were formed outside of his body. As part of his reparative treatment, his organs were wrapped in a sac and gently pushed back into his body over the course of several weeks. Once his organs were properly positioned, he developed pneumatosis, an air sac in his abdomen that was potentially fatal.

The Child was finally discharged from the hospital two months after his birth. Shortly thereafter, he returned to the hospital after having fallen out of his grandmother's bed. He suffered from a right parietal skull fracture as a result of the fall. Approximately five months later, his grandmother dropped him while sleeping with him in her arms at the hospital. The next day, a nurse observed Mother sleeping with the Child in her arms. The nurse advised Mother that the Child needed to sleep alone in his crib for his safety. Hours later, the nurse returned to find Mother sleeping with the Child in her arms again. When Mother continued to sleep with the Child, despite being advised against such behavior, a meeting was arranged wherein the Child's doctor again advised Mother of the potential harm given the Child's fragile state. Despite the meeting, another nurse found Mother sleeping with the Child the next day. This time, the nurse had to unwrap the Child's IV cord from around his neck. Mother remained adamant that her behavior was not harmful and stated her intention to continue sleeping with the Child once he was discharged from the hospital.

Following the Child's discharge from the hospital, Mother failed to return the Child to the hospital for his scheduled appointments and also blatantly disregarded important medical instructions concerning his care, namely she allowed him to drink water after being advised that the ingestion of water could cause his death. In March 2011, the Child was removed by the Tennessee Department of Children's Services ("DCS") as a result of Mother's refusal to comply with medical advice and Father's inability to care for the Child due to his incarceration. Three months later, the Child was subsequently adjudicated as dependent and neglected due to Father's incarceration and Mother's medical neglect and a failed drug screen. Mother and Father (collectively "Parents") signed the criteria and procedures for termination of parental rights.

DCS developed a permanency plan on April 19, 2011, and another on October 26, 2011. These plans were ratified by the trial court. Pursuant to the plans, Mother was

required to complete a mental health assessment and follow all recommendations, use medication only as prescribed, cooperate with random drug screening, and receive necessary medical care. Pursuant to the plans, Father was required to complete his jail sentence, comply with the requirements of his probation, abide by the law, remain drug free, complete an alcohol and drug assessment and follow all recommendations, cooperate with random drug screening, secure housing and employment when he was released from jail, and remit child support in the amount of $100 per month.

In March 2012, the Child was returned to Parents for a 90-day trial home placement as a result of their compliance with the permanency plans. Three months later, the Child was returned to DCS custody when Parents failed their respective drug screens and it was discovered that the Child had missed several important medical appointments while in their care. Father also violated his probation and incurred new criminal charges on September 14, 2012, when a police officer stopped Parents and found a syringe containing cocaine and methamphetamine under the passenger seat of the car. Father admitted ownership of the syringe and was taken into custody.

To address the return of the Child to DCS custody, DCS developed a new permanency plan on November 20, 2012. This plan was also ratified by the trial court. The plan required Mother to remit child support,[2] use medication only as prescribed, complete an alcohol and drug assessment and follow all recommendations, cooperate with random drug screening, and follow the recommendations of her previously-completed mental health assessment. The plan required Father to remit child support, provide a safe and stable home environment, refrain from the abuse of drugs or alcohol, cease illegal activities, and complete an alcohol and drug assessment while in jail, if possible.

DCS filed a petition to terminate each parent's parental rights to the Child on February 8, 2013. DCS alleged that Parents had abandoned the Child by failing to remit child support and by failing to provide a suitable home, that they had failed to substantially comply with the permanency plans, and that the conditions which led to removal persisted. A hearing was held at which several witnesses testified.

Beth Miracle, a foster team leader with DCS, testified that she first worked with the Child in 2010, when he was referred for medical neglect. She related that the 2010 case was eventually resolved but that she opened a new case in February 2011, when he was referred for medical neglect and lack of supervision. She recalled that Mother failed her drug screen on June 22, 2011, the day of the adjudicatory hearing, and that the Child was adjudicated as

---

[2]Mother had not previously been required to remit child support because she had not yet reached the age of majority.

dependent and neglected and placed in foster care. She conceded that Mother claimed to have a valid prescription but asserted that Mother failed to produce the prescription upon request. She acknowledged that she had not tested Mother prior to the adjudicatory hearing and that she did not have reason to believe that Mother was abusing drugs prior to her receipt of the failed drug screen.

Terri Devaney, a case manager with DCS, testified that she was assigned to the Child's case from March 2011 until November 2012. Relative to Mother, she testified that Mother had only remitted a total of $54 in child support, despite a short period of employment at Burger King and then at Wal-Mart in the four months prior to the filing of the termination petition. She acknowledged that Mother injured her hip in January 2013 and needed the assistance of a walker for mobility. She asserted that Mother either missed her appointment or refused to provide a urine sample for several of her scheduled drug screens. She acknowledged that Mother completed an alcohol and drug assessment in July 2012 but stated that the facility was unable to provide a recommendation because Mother could not provide a urine sample. She conceded that Mother completed a second assessment as required but asserted that Mother refused the treatment recommended by the facility. She claimed that Mother simply denied the need for treatment and repeatedly requested a third assessment. She related that she referred Mother to Youth Villages after Mother completed her mental health assessment. She conceded that Mother was "extremely compliant" with their services and was progressing until the program ended in September 2012. She acknowledged that Mother also successfully addressed her own medical needs as required by the first permanency plan.

Ms. Devaney acknowledged that Mother was in DCS custody when the Child was removed. She conceded that she did not appoint a guardian ad litem for Mother even though she believed that Mother's custodian was not providing adequate supervision. She testified that Mother never missed a visitation with the Child and that the Child enjoyed a bond with Mother and would undoubtedly miss Mother if her parental rights were terminated. She explained that the Child also enjoyed a strong bond with his foster family and that he had finally readjusted to his surroundings following his short trial home placement with Mother. She related that despite the trial home placement, the Child had resided with the foster parents since March 2011. She conceded that Mother had physical housing for the Child but claimed that DCS was primarily concerned about her substance abuse issues and Father's criminal activity.

Relative to Father, Ms. Devaney testified that when Father was not incarcerated, he regularly visited the Child. Ms. Devaney testified that Father was incarcerated from September 2012 until May 2013, well after the termination petition was filed. She related that in the four months preceding the filing of the termination petition, Father remitted

approximately $92 in child support. She acknowledged that Father's child support was paid pursuant to a garnishment order and that approximately $23 was garnished from each paycheck he received. She had no knowledge concerning the rate of pay Father received but opined that Father was clearly able to work. She acknowledged that Father completed his alcohol and drug assessment and that he was not required to seek further treatment and that he had not failed a drug screen since June 2012. However, Father refused to take a drug test in August 2012.

Relative to DCS's efforts in assisting Parents, Ms. Devaney claimed that she had trouble communicating with Parents and that they often missed the Child's medical appointments. She explained that she assisted Mother in setting up medical appointments for the Child on a regular basis and that she even made appointments for Mother. She conceded that Mother was not informed of emergency appointments or appointments scheduled by the foster mother. She acknowledged that the trial court admonished DCS for failing to assist Mother in scheduling a second alcohol and drug assessment and refused to find that DCS had expended reasonable efforts at that time. She explained that she requested funds for Mother to complete a second assessment and that she provided Mother with pertinent information to follow through with the assessment. She claimed that Mother erroneously reported that the facility would not accept her insurance even though she personally confirmed that Mother's insurance was acceptable. She stated that her additional request for funds was denied because Mother had insurance. She recalled that DCS hosted multiple child and family team meetings, that DCS made several referrals for the required alcohol and drug assessments, assisted Parents during the trial home visit, and at times, provided in-home services.

Winter Ford, a family services worker with DCS, testified that she was first assigned to the case in April 2013, after the termination petition had been filed. She acknowledged that Mother had injured herself at some point but asserted that Mother appeared fine when she observed a visitation several weeks later. She assisted Mother in scheduling a third alcohol and drug assessment because Mother disagreed with the recommendations from the second assessment. She recalled that following the third assessment, the facility recommended that Mother complete alcohol and drug treatment. Despite the facility's recommendation, Mother never completed treatment and was adamant that she did not have a drug problem. She acknowledged that she never provided Mother with a specific referral for treatment. She stated that Mother failed to attend a scheduled drug screening in July 2013 and that Mother failed a drug screen in August 2013 and was unable to provide a current prescription. She attempted to visit Mother's residence, but Mother cancelled the visit and had not rescheduled. She acknowledged that she was in the process of increasing Mother's visitation time with the Child and that Mother's visits were therapeutic in nature, meaning

that DCS was hopeful that Mother could regain custody. She related that the Child's health had improved and that the Child no longer needed intensive medical treatment.

Ms. Winter acknowledged that she maintained little contact with Father because Father was incarcerated when she was assigned to the case. She related that Father was released in May 2013 and that she last spoke with him in June or July 2013, when Father was living in a halfway home. She believed that Father had moved out of the halfway home, but she had not visited the new residence. She admitted that she did not assist Father with finding suitable housing and that she had not even scheduled a recent drug screen or attended Father's visitation with the Child.

Kristy Troutman, a clinical supervisor for Health Connect America ("Health Connect"), a for-profit agency that provides alcohol, drug, and mental health treatment, testified that she received two referrals from DCS regarding Mother. She related that she performed an alcohol and drug assessment on Mother in December 2012. She claimed that Mother passed her drug screen but was "very closed and guarded in the assessment." She recommended treatment because Mother had previously failed drug screens and because Mother admitted past drug use. She completed the second alcohol and drug assessment in May 2013. She recalled that Mother was late, appeared "sluggish" and "drowsy," and "nodded off a couple of times while filling out the paperwork." She stated that Mother was unable to complete a portion of the testing because of her tardiness. She explained that she completed the clinical interview and a drug screen. She stated that Mother failed the drug screen but had a prescription for two of the three drugs that appeared in the results. As a result of the interview and testing, she recommended that Mother receive alcohol and drug treatment.

Leanne Goldstein, the clinical manager at Foothills Care, Inc. ("Foothills"), which provides therapeutic visitation, counseling, and other services for families, testified that she received a referral to provide therapeutic visitation and parenting services for Mother and the Child in May 2013. She recalled that Mother was often late for visitation and "spent a lot of time outside smoking on the porch by herself or with her mother." She stated that Mother often blamed others for her problems and contradicted herself when providing excuses for her behavior. She related that Mother failed a drug screen in June 2013 and was unable to provide a urine sample for another drug screen in July 2013. She also attempted to provide parenting education for Mother, who was either late, left early, or failed to appear for the scheduled sessions. She conceded that Mother participated in one full parenting education session during her last visit. She acknowledged that Mother's inability to participate was partially caused by her mother's interference and others that were present in the home. She opined that based upon her interactions with Mother, she did not believe that Mother was capable of parenting the Child in the near future. She explained that Mother was successful

in exhibiting proper parenting skills only when she was fully attentive to the Child's needs and not distracted by others. She acknowledged that she never worked with Father.

Joseph N. ("Foster Father") testified that he was the Child's great-uncle and had served as his foster father for approximately two and a half years. He related that he and his wife loved the Child and enjoyed a bond with the Child as a result of their extended time parenting the Child. He stated that they had the financial resources to provide for the Child's needs and that their home was suitable for the Child. He claimed that he and his wife intended to adopt the Child.

Mother, who was 19 years old at the time of the hearing, testified that she became pregnant with the Child when she was 15. She claimed that at times, DCS failed to inform her of the Child's medical appointments and that the Child was not with her when he missed appointments during his trial home placement. She related that she had signed every medical release that was necessary for DCS to possess. She believed that DCS did not give her a fair opportunity to regain custody of the Child and that Ms. Troutman was "hateful" and "standoffish" toward her during her assessment. She asserted that she was willing to take another alcohol and drug assessment from another facility and claimed that she would comply with that facility's results. She asserted that she could provide a suitable home for the Child, despite DCS's failure to assist her in regaining custody of the Child. She expressed love for the Child and claimed to enjoy a very strong bond with the Child. She asserted that she was willing to do anything to regain custody of him.

Relative to her employment, Mother acknowledged that she had previously worked at Burger King for approximately one month and that she later worked at Wal-Mart for approximately six weeks, beginning in October 2012. She claimed that she was unable to work after she injured her hip in January 2013. She acknowledged that she was present when Father was arrested for possession of drugs and drug paraphernalia in September 2012 and that she refused to submit to a drug screen three days after Father's arrest. She explained that she intended to schedule a drug screen with her physician but that she later learned that her physician would not provide a drug screen. Despite her positive drug screens, she denied having a drug problem. She claimed that DCS denied her request for a new drug screen on at least one occasion when she believed the results were erroneous. She explained that she was required to take a number of valid prescriptions for her numerous health issues. She identified her medical records, which included various prescriptions, dated January 2013 through April 2013.

Following the presentation of the above evidence, the trial court terminated each parent's parental rights on the statutory grounds of abandonment for failure to support, substantial noncompliance with the permanency plans, and the persistence of conditions

which led to removal. The court also found that Mother had abandoned the Child by failing to provide a suitable home. The court further held that termination of each parent's parental rights was in the best interest of the Child. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Parents as follows:

A. Whether clear and convincing evidence supports the trial court's termination of each parent's parental rights to the Child because of their failure to remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(A).

B. Whether clear and convincing evidence supports the trial court's termination of Mother's parental rights to the Child because of her failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii).

C. Whether despite reasonable efforts by DCS, clear and convincing evidence supports the trial court's termination of each parent's parental rights to the Child because of their substantial noncompliance with the permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

D. Whether despite reasonable efforts by DCS, clear and convincing evidence supports the trial court's termination of each parent's parental rights to the Child because the conditions which led to removal persist pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

E. Whether clear and convincing evidence supports the trial court's finding that termination of each parent's parental rights was in the Child's best interest pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149

S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

As relevant to this case, abandonment for failure to remit support means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Likewise, when the parent is incarcerated when the petition is filed, abandonment means that:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). A parent's willful failure to support the child or make reasonable payments toward support of the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

This court has consistently held that the term willfulness as it applies to a party's failure to support a child must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). Indeed, "defining abandonment as the mere non-payment of support [is] unconstitutional because this language creates an irrebuttable presumption of abandonment, irrespective of intent." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (citing *In re Swanson*, 2 S.W.3d at 188). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

### *Mother*

Mother asserts that the trial court erred in terminating her parental rights based upon the ground of abandonment for willful failure to remit support. She concedes that she failed

to remit support during the statutory period but asserts that her failure to remit support was not willful because she was unable to work as a result of a physical injury. DCS responds that Mother was employed and able to provide support for at least a portion of the relevant time period. DCS claims that despite Mother's alleged injury, she remained very active and never filed a claim for disability. The guardian ad litem likewise responds that Mother failed to offer any medical evidence concerning her injury.

The relevant period for our consideration is the four months immediately preceding the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Since the petition was filed on February 8, 2013, the relevant four month period would be October 8, 2012, through February 7, 2013.[3] During that period, Mother admittedly failed to remit any support, despite her employment for at least six weeks, beginning in October 2012. According to the proof presented at trial, Mother only paid $54.00 for support during the whole time the child was in custody and that payment was made in September prior to the commencement of the four month period. This was not a case where a parent had numerous expenses but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 6, 2011) (reversing the trial court's decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Mother was aware of her obligation to remit support because it was a requirement contained in the most recent parenting plan and because she had remitted a small amount of support throughout the Child's placement with DCS. However, she failed to remit any support when she was employed and offered no explanation for her failure to remit support during that time. The only explanation offered by Mother concerns an injury that occurred in January 2013, as evidenced by her use of a walker on February 13, 2013, and crutches in April 2013. As previously stated, the relevant period for our consideration is October 8 through February 7. Accordingly, we conclude that there was clear and convincing evidence to support termination of Mother's parental rights based upon her abandonment of the Child for her willful failure to remit any child support during the relevant period when she was employed. Thus, a statutory ground existed for termination of Mother's parental rights.

*Father*

Father asserts that the trial court erred in terminating his parental rights based upon the ground of abandonment for willful failure to remit support. DCS concedes that Father

_____

[3]"The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

paid some support during the relevant time period and that the record was devoid of evidence concerning the amount he was able to pay.

Since Father was incarcerated, the relevant period for our consideration is the four months immediately preceding his incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv). Father was incarcerated on September 14, 2012. The relevant four month period would be May 14, 2012, through September 13, 2012. During that time period, Father regularly remitted support as a result of a garnishment order. While Father was working and obviously receiving a paycheck, no evidence was presented to establish that his regularly submitted payments were token in nature. Accordingly, we conclude that the trial court erred in relying on section 36-1-102(1)(A)(iv) as a statutory ground for termination. We reverse the trial court's finding that termination of Father's parental rights was appropriate based upon his failure to remit support. This conclusion does not end our inquiry because only one statutory ground for termination of parental rights listed in section 36-1-113(g) is sufficient to support an order terminating parental rights when termination is in the best interest of the child. *In re Audrey S.*, 182 S.W.3d at 860.

B.

Mother asserts that the trial court erred in relying upon the statutory ground of abandonment for failure to provide a suitable home when housing had never been an issue in the case and was never addressed in the permanency plan. She likewise claims that her alleged failure to provide a suitable home was a result of DCS's failure to assist her. DCS responds that it expended reasonable efforts in attempting to assist Mother in her ability to provide a suitable home free from drug abuse. DCS claims that despite its efforts, Mother refused to acknowledge her need for treatment.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. The relevant abandonment statutory provision provides, in pertinent part,

> The child has been removed from the home of the [parents] as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child [], and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; *and* for a period of four (4) months *following the removal*, the department or agency has made reasonable efforts to assist the [parents] to

-13-

establish a suitable home for the child, but that the [parents] have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a [parent] in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the [parent] toward the same goal, when the [parent] is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added). Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii). *See generally In re R.L.F.*, 278 S.W.3d 305, 315-16 (Tenn. Ct. App. 2008) (providing that DCS must submit clear and convincing evidence to establish that it expended reasonable efforts in assisting the parent when a termination ground based upon DCS's efforts is implicated). DCS is required to use its "superior insight and training to assist parents with the problems DCS has identified in the permanency plan, whether the parents ask for assistance or not." *State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). A "suitable home requires more than a proper physical living location." *State v. C. W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). It requires that the home be free of drugs. *Id.*

Admittedly, Mother's physical home was never questioned by DCS given that she lived with different relatives throughout the entirety of the case. The three months following the Child's removal were spent addressing the Child's medical neglect. It was not until the third month following removal that DCS discovered Mother's possible abuse of prescription drugs. DCS spent the majority of the time addressing the major concern regarding Mother's care of the Child in this case: her drug abuse. Indeed, the Child's medical issues were resolved to the point where he is no longer in need of intensive medical care.

The efforts of DCS were frustrated by Mother's lack of cooperation, namely she refused to provide a urine sample for the first alcohol and drug assessment, was "very closed and guarded" during the second assessment, and was late, appeared "sluggish" and "drowsy," and "nodded off a couple of times while filling out the paperwork" for the third assessment. If Mother had simply put forth some effort in properly completing one of the three assessments offered to her and then simply followed the recommendations, she could have easily regained custody of the Child. Instead, Mother proceeded to blame others and refused to take any responsibility for her actions. She also refused to submit to several drug screens and failed to provide current prescriptions to account for some of her positive drug screens.

-14-

Her failure to properly address the issue preventing her from regaining custody of the Child demonstrates a lack of concern for the welfare of the Child such that it was unlikely that the conditions would be remedied at an early date. With these considerations in mind, we conclude that the record contains clear and convincing evidence that DCS made reasonable efforts to assist Mother in providing a suitable home and that the evidence does not preponderate against the court's finding that a second statutory ground existed for termination of her parental rights based upon her inability to provide a suitable home.

C.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Once a child has been removed from a parent's home, DCS is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, DCS must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of DCS's involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by the [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [DCS's] efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"While [DCS's] reunification efforts need not be "herculean," DCS must do more than simply provide the parents with a list of services and send them on their way." *Id.* "[DCS] employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In keeping with this ideal, DCS must provide an affidavit, identifying its reasonable efforts, for the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. However, "'[r]eunification of a family is a two-way street, and the law does not require [DCS] to carry the entire burden of this goal." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

### *Mother*

Mother asserts that she was in substantial compliance with the final permanency plan and that her compliance far exceeded DCS's efforts when DCS failed to provide Mother with a referral to a treatment program and allowed substantial time to pass between the creation of the second and third permanency plans. Mother claims that despite her compliance, the plans were not reasonably related to remedying the conditions which led to the Child's removal, namely medical neglect. DCS responds that the requirements contained in the permanency plans were reasonable and related to the conditions which led to removal. DCS asserts that while Mother completed some of the requirements, she was not in substantial compliance with the permanency plans' central obligations designed to achieve reunification. The guardian ad litem responds that despite reasonable efforts by DCS, Mother simply failed to substantially comply with the requirements of the permanency plans.

Here, Mother was required to complete a mental health assessment and follow all recommendations, complete an alcohol and drug assessment and follow all recommendations, use medication only as prescribed, cooperate with random drug screening, receive necessary medical care, and remit child support. We believe that these requirements were reasonable and related to remedying the conditions that led to the Child's removal and that ultimately resulted in his inability to return home. The Child was initially removed from Mother as a result of her continued medical neglect. However, the Child remained in custody as a result of Mother's failed drug screens and refusal to receive treatment.

-16-

Mother completed some of the action steps contained in the plans, namely she completed a mental health assessment and followed the recommendations from that assessment, she received necessary medical care, and she completed an alcohol and drug assessment. However, she failed to regularly remit child support. More importantly, she failed to address the primary issue that prohibited her reunification with the Child, namely her alleged drug abuse. As previously stated, any efforts expended by DCS were frustrated by Mother's lack of cooperation and refusal to accept responsibility for her actions. Mother was uncooperative in each of the three alcohol and drug assessments, she refused to submit to several drug screens, and she failed to provide current prescription information to account for some of her positive drug screens.

In an attempt to assist Mother in her reunification efforts, DCS conducted at least 12 child and family team meetings, provided Mother with three referrals for three separate alcohol and drug assessments, provided therapeutic visitation and parenting education, and coordinated dozens of urine drug screens. Mother asserts that DCS was to blame for her failure to receive treatment because DCS never offered a referral for drug treatment. However, at trial, she disagreed with the findings from the second and third assessments and claimed that she was entitled to a fourth assessment because Ms. Troutman was obviously biased against her. She asserted that she would only comply with the recommendations from a fourth assessment if it were provided by a different facility. Mother's testimony at trial was indicative of her uncooperative and defiant behavior throughout the entirety of her involvement with DCS. With these considerations in mind, we conclude that DCS made reasonable efforts to assist Mother and that while Mother attempted to comply with some of the requirements, the trial court's finding that Mother was in substantial noncompliance with the permanency plan is supported by clear and convincing evidence. Thus, a third statutory ground existed for termination of Mother's parental rights.

*Father*

Father asserts that he was in substantial compliance with the permanency plans and that he had managed his substance abuse issues to the best of his ability. He claims that his failure to obtain suitable housing was a result of DCS's lackluster efforts in providing assistance. DCS concedes that it failed to assist or even contact Father after his release from jail and does not defend the termination of Father's parental rights. The guardian ad litem responds that Father failed to substantially comply with the requirements of the permanency plans when he engaged in illegal activity in September 2012. He claims that DCS cannot be held at fault for Father's failure to abide by the law.

Here, Father was required to comply with the requirements of his probation, abide by the law, refrain from the abuse of drugs or alcohol, complete an alcohol and drug assessment

and follow all recommendations, cooperate with random drug screening, secure housing and employment when he was released from jail, and remit child support in the amount of $100 per month. We believe that these requirements were reasonable and related to remedying the conditions that led to the Child's removal and that ultimately resulted in his inability to return home. The Child was initially removed from Father as a result of his inability to parent the Child due to his incarceration. The Child remained in custody as a result of Father's failed drug screens and continued inability to abide by the law.

Father completed some of the action steps contained in the plans, namely he completed an alcohol and drug assessment and regularly remitted child support. However, he failed to address the primary issue that prohibited his reunification with the Child, namely his inability to abide by the law. DCS assisted Father by providing drug screens, which he, at times, failed or refused to take, and by providing an alcohol and drug assessment. We acknowledge that DCS's interaction with Father was limited; however, we fail to see what additional efforts DCS could have expended due to his repeated criminal behavior while the Child languished in DCS custody. Indeed, Father was not released from jail until after the termination petition had already been filed. With these considerations in mind, we conclude that DCS made reasonable efforts to assist Father and that while Father attempted to comply with some of the requirements, the trial court's finding that Father was in substantial noncompliance with the permanency plan is supported by clear and convincing evidence. Thus, a statutory ground existed for termination of Father's parental rights.

D.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed *from the home of the parent or guardian* by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal *or* other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874.

The Child was initially removed as a result of Mother's medical neglect and Father's inability to parent the Child as a result of his incarceration. Once it was discovered that Parents struggled with drug addiction, the Child remained in custody while Parents were seemingly provided with time to combat their addictions and Father resolved his legal issues. Parents' testimony at trial reflected that the conditions which led to removal persisted and that "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect" persisted. Mother denied that she ever struggled with drug abuse, despite receiving two recommendations for drug treatment. Mother never accepted full responsibility for her actions and questioned the reliability of the drug screens and the assessments. Likewise, Father allowed the Child to languish in DCS custody for years while he continued in his illegal behavior. Thus, there was little likelihood that the conditions prohibiting the return of the Child would be remedied. Accordingly, the evidence does not preponderate against the trial court's finding that despite reasonable efforts by DCS, persistent conditions were established by clear and convincing evidence; that continuation of the parent-child relationship would greatly diminish the Children's integration into a safe, stable, permanent home; that a fourth statutory ground existed for termination of Mother's parental rights to the Child; and that a second statutory ground existed for termination of Father's parental rights to the Child.

E.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate each parent's parental rights, we must consider whether termination of their rights was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i).  "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child."  *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).  The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are

hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

*Mother*

A number of the best interest factors weigh against Mother. She had not made the adjustment of circumstances necessary to provide a stable home for the Child as evidenced by her refusal to accept responsibility for her actions. Tenn. Code Ann. § 36-1-113(i)(1), (2). The Child resides in a safe and stable foster home that expressed a desire to adopt him. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether Mother can provide a safe and stable home free from drug abuse. Tenn. Code Ann. § 36-1-113(i)(7). Mother has failed to regularly remit child support. Tenn. Code Ann. § 36-1-113(i)(9). We acknowledge that Mother obviously cared for the Child. However, her inability to accept responsibility for her actions place doubt upon her ability to effectively parent the Child in the near future. The Child needs permanency and stability, which he can receive from the foster parents who have successfully parented him while Mother allowed the Child to languish in custody. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. Accordingly, we affirm the decision of the trial court.

*Father*

A number of the best interest factors weigh against Father. He had not made the adjustment of circumstances necessary to provide a stable home for the Child. Tenn. Code Ann. § 36-1-113(i)(1). Father only maintained sporadic visitation with the Child as a result of his incarceration. Tenn. Code Ann. § 36-1-113(i)(3). The Child resides in a safe and stable foster home that expressed a desire to adopt him. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether Father can provide a safe and stable home free from drug abuse and illegal activity. Tenn. Code Ann. § 36-1-113(i)(7). With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is reversed as to the termination of Father's parental rights based upon his willful failure to remit child support. The judgment of the trial court is affirmed in all other respects. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed equally to the appellants, Lillian A. C. and Joshua C.

_____
JOHN W. McCLARTY, JUDGE